Order [__ __

## EXHIBIT "ONE"

**16981**

Lot 242 of College View Estates Unit No. 7, in the City of San Diego, County of San Diego, State of California, according to Map thereof No. 3629, filed in the Office of the County Recorder of San Diego County, April 23, 1957.

Assessors Parcel No, 461-460-08

(Rev. 11/17/04)

# NOTE

September 1, 2005                     VISTA                    CALIFORNIA
    [Date]                         [City]                         [State]

### 5151 DORMAN DRIVE, SAN DIEGO, CA  92115

[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 649,000.00       (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Downey Savings and Loan Association, F.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of       6.250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st     day of each month beginning on November 1, 2005     . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on October 1, 2035     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 6060, 3501 Jamboree Rd, Newport Beach, CA 92658-6060                         or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 3,996.01

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-5N (0207).01        Form 3200 1/01

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 3        Initials:

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.



### 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.


WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED,

_____(Seal)          _____(Seal)
MICHELE H. BROWN              -Borrower                                          -Borrower


_____(Seal)          _____(Seal)
                              -Borrower                                          -Borrower


_____(Seal)          _____(Seal)
                              -Borrower                                          -Borrower


_____(Seal)          _____(Seal)
                              -Borrower                                          -Borrower


*[Sign Original Only]*

Recorded Requ    Of
**FIDELITY NATIONAL TITLE**
**SAN DIEGO OFFICE**

Recording Requested By:
Downey Savings and Loan
Association, F.A.
Return To:
Downey Savings and Loan
Association, F.A.
P.O. Box 6060, 3501 Jamboree
Rd, Newport Beach, CA
92658-6060

16967

Prepared By:
Downey Savings and Loan
Association, F.A.
P.O. Box 6060, 3501 Jamboree Rd,
Newport Beach, CA 92658-6060

DOC #    2005-0783467

SEP 09, 2005    4:10 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:        54.00
PAGES:       16        DA:        1

2005-0783467

———————[Space Above This Line For Recording Data]———————

# DEED OF TRUST

**Title Order No.: 05-2452804**
**Escrow No.: 16494-SM**
**APN: 461-460-08**

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated September 1, 2005
together with all Riders to this document.
(B) "Borrower" is MICHELE H. BROWN, A Married Woman as her sole and separate
property

Borrower's address is 5151 DORMAN DRIVE, SAN DIEGO CA 92115
. Borrower is the trustor under this Security Instrument.
(C) "Lender" is Downey Savings and Loan Association, F.A.

Lender is a federally chartered savings association
organized and existing under the laws of the United States of America

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3005 1/01

-6(CA) (0207)
Page 1 of 16            Initials: MHB

VMP MORTGAGE FORMS - (800)521-7291

16968 ✕

Lender's address is 3501 Jamboree Road, Newport Beach, CA 92660

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is DSL Service Company, A California Corporation

(E) "Note" means the promissory note signed by Borrower and dated September 1, 2005
The Note states that Borrower owes Lender six hundred forty-nine thousand and 00/100
                                                                                                    Dollars
(U.S. $649,000.00            ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than October 1, 2035              .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider  ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider          ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider               ☐ Biweekly Payment Rider         ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

-6(CA) (0207)                          Page 2 of 15          Initials                Form 3005  1/01

16968A

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
              County               of                   SAN DIEGO      :
    [Type of Recording Jurisdiction]           [Name of Recording Jurisdiction]
LOT 242 OF COLLEGE VIEW ESTATES UNIT NO. 7, IN THE CITY OF SAN DIEGO,
COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO.
3629, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY,
APRIL 23, 1957.

Parcel ID Number: 461-460-08                       which currently has the address of
5151 DORMAN DRIVE                                       [Street]
SAN DIEGO                       [City], California 92115     [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

-6(CA) (0207)                Page 3 of 15         Initials          Form 3005  1/01

16969

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

**16970**

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials

16971

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

**16972**

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**16974**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

16975

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

## 16978

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

# 16978

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

03681    16979

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                _____ (Seal)
                                                MICHELE H. BROWN                -Borrower


                                                _____ (Seal)
_____                                                -Borrower


_____ (Seal)             _____ (Seal)
                          -Borrower                                            -Borrower


_____ (Seal)             _____ (Seal)
                          -Borrower                                            -Borrower


_____ (Seal)             _____ (Seal)
                          -Borrower                                            -Borrower

**16980**

State of California
County of $San Diego$                                    } ss.

On $September 2, 2005$ before me, $Cynthia L. Greene$
                                                                    personally appeared

MICHELE H. BROWN

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

CYNTHIA L. GREENE
Commission # 1359542
Notary Public - California
San Diego County
My Comm. Expires Jun 4, 2006

RECORDING REQUESTED BY

U.S. Bank National Association

WHEN RECORDED MAIL TO:

U.S. Bank National Association
Attn: Compliance
3121 Michelson Drive, 5th Floor
Irvine, CA 92612

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## AFFIDAVIT
## OF THE
## FEDERAL DEPOSIT INSURANCE CORPORATION

I, Steven A. Carr, having been first duly sworn, hereby make this Affidavit and state that:

1. I am an authorized representative of the Federal Deposit Insurance Corporation ("FDIC"), an agency of the United States government.

2. On November 21, 2008, Downey Savings and Loan Association, F.A. ("Downey Savings") was closed by the Office of Thrift Supervision and the FDIC was appointed as receiver.

3. As authorized by Section 11(d)(2)(G)(i)(II) of the Federal Deposit Insurance Act, 12 U.S.C. Section1821(d)(2)(G)(i)(II), the FDIC as receiver for Downey Savings may transfer any asset or liability of Downey Savings without any approval, assignment or consent with respect to such transfer.

4. Pursuant to the terms and conditions of a Purchase and Assumption Agreement between the FDIC as receiver for Downey Savings and U.S. Bank National Association ("U.S. Bank"), dated November 21, 2008 ("Purchase and Assumption Agreement"), U.S. Bank acquired certain of the assets, including all loans and all loan commitments, of Downey Savings.

5. As a result, on November 21, 2008 U.S. Bank became the owner of the loans and loan commitments of Downey Savings by operation of law.

Executed this 28 day of October 2009 at Dallas, Texas.

Steven A. Carr
Receiver in Charge for FDIC as
Receiver for Downey Savings and
Loan Association, F.A.

I HEREBY CERTIFY THIS TO BE A TRUE AND EXACT
COPY OF THE ORIGINAL
Dated:  4/20/10
U.S. Bank National Association
By    :  _____
Name :  RICHARD B. SWINNEY
Title :  Vice President

STATE OF TEXAS )
) ss.
COUNTY OF DALLAS )

On October 28, 2009, before me, Deborah Kay Miller , personally appeared Steven A. Carr, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Texas that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.                    (Seal or Stamp)

Signature: Deborah Kay Miller
My Commission expires:  03-28-2011
My Commission number: _____

DEBORAH KAY MILLER
NOTARY PUBLIC
State of Texas
Comm. Exp. 03-28-2011

EXECUTION VERSION

## ASSIGNMENT AND ASSUMPTION OF INTERESTS AND OBLIGATIONS

THIS ASSIGNMENT AND ASSUMPTION OF INTERESTS AND OBLIGATIONS ("Assignment") is made and entered into as of the 20th day of April, 2009 by and between the Federal Deposit Insurance Corporation as Receiver for Downey Savings & Loan Association, F.A. ("Assignor") and U.S Bank National Association ("Assignee").

Whereas, Assignor and Assignee have entered into that certain Loan Sale Agreement dated November 21, 2008 (the "LSA"), pursuant to which Assignor has agreed to sell, assign, transfer and convey to Assignee all the assets identified on Exhibit A attached to this Agreement (the "Assets").

Whereas, pursuant to a Bill of Sale of even date herewith, Assignor has conveyed to Assignee that part of the Assets which consists of tangible personal property.

Whereas, part of the Assets may consist of documents and instruments evidencing loans (including without limitation, promissory notes, loan agreements, shared credit or participation agreements, inter-creditor agreements, letters of credit, reimbursement agreements, drafts, bankers' acceptances, transmission system confirmations of transaction and other evidences of indebtedness, including loan histories, affidavits, general collection information, correspondence and comments pertaining to such obligations), and equipment leases (the "Agreements to Pay").

Whereas, another part of the Assets may consist of documents securing Agreements to Pay, such as mortgages, deeds of trust, security agreements, loan agreements and other documents or instruments of similar nature relating to the Agreements to Pay (the "Collateral Documents").

Whereas, another part of the Assets may consist of real estate, Contracts for Deed to real estate, and leases, tenancies, concessions, licenses and other rights of occupancy or use related to real estate (including any security deposits relating thereto in Assignor's possession) (the "Real Estate Interests").

Whereas, another part of the Assets may be affected by contracts relating to the Assets, such as collection and service agreements (the "Miscellaneous Agreements"). The term "Miscellaneous Agreements" does not include loan servicing agreements between Assignor and independent contractors.

Whereas, under the LSA, Assignor has agreed to assign and convey to Assignee all of Assignor's right, title and interest to the Agreements to Pay, the Collateral Documents, the Real Estate Interests and the Miscellaneous Agreements related to the Assets.

Whereas, Assignee has agreed to accept and assume all of Assignor's duties, obligations and liabilities under the Agreements to Pay, Collateral Documents, Real Estate Interests and Miscellaneous Agreements related to the Assets (the "Obligations").

Whereas, the term "Advances" as used herein means the sum of all unreimbursed amounts advanced by or on behalf of the failed institution(s) which once owned the Assets (i) to

protect the noteholder's lien position or the collateral, including payment of ad valorem taxes and hazard and forced placed insurance as permitted by the terms of any loan, or (ii) to meet required scheduled payments. The term "Advances" does not include (A) incremental funding of loan proceeds under an Agreement to Pay, such as in the case of a revolving credit loan or a construction loan, or (B) the payment of appraisal fees, broker opinion fees, attorney fees and associated legal fees, foreclosure fees, trustee fees, property inspection fees, property preservation and operating cost fees, tax penalties, title policies, lien search fees, or any other cost that can be directly associated with the collection and servicing of a loan.

NOW THEREFORE, in consideration of the foregoing and the sum of ten dollars ($10.00), and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.    Assignor's Assignment.  Assignor hereby transfers, grants, conveys and assigns to Assignee all of Assignor's right, title and interest in the Agreements to Pay, the Collateral Documents, the Real Estate Interests and the Miscellaneous Agreements.

2.    Assignee's Acceptance.  Assignee does hereby accept such assignment from Assignor and assumes all Obligations arising from and after the date hereof. The Obligations assumed include, without limitation, any and all obligations to (i) make payments relating to Agreements to Pay serviced by Assignor; (ii) make Advances with respect to Agreements to Pay serviced by Assignor, (iii) reimburse third party servicers for Advances on Agreements to Pay, and (iv) make incremental disbursements of loan proceeds, such as in the case of a revolving credit loan or a construction loan.

3.    Assignee's Covenants regarding Securities Law.  Assignee hereby represents and warrants to, and covenants with Assignor as follows:

a.    Assignee understands that (a) neither the Assets, nor any interest therein or evidence thereof, has been registered or qualified under the Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state or any other jurisdiction, and (b) the Assignor is not required, and does not intend, to so register or qualify the Assets.

b.    Assignee is a substantial, sophisticated investor having such knowledge and experience in financial and business matters, and in particular in matters relating to the purchase, sale, origination or ownership of notes and loan participations such as the Assets, that it is capable of evaluating the merits and risks of investment in the Assets and understands and is able to bear the economic risks of such an investment (including a total loss of its investment and the risk that Assignee might be required to hold the Assets for an indefinite period of time).

c.    Assignee is acquiring the Assets for investment, for its own account, and not for or on account of any other person or entity, and not with a view to or for sale in connection with a distribution within the meaning of Section 5 of the Securities Act.

2

d.      Assignee has been furnished with, and has had an opportunity to review and understands, all information relating to the Assets as has been requested and as is considered necessary by Assignee, and has had all questions arising from or relating to such review answered to the satisfaction of Assignee.

e.      Neither Assignee nor anyone acting on its behalf has (i) offered, transferred, pledged, sold or otherwise disposed of any of the Assets (or any interest therein or evidence thereof) or, (ii) solicited any offer to buy or accept a transfer, pledge or other disposition of any of the Assets (or any interest therein or evidence thereof) from, or (iii) otherwise approached or negotiated with respect to any of the Assets (or any other interest therein or evidence thereof) with any person or entity in any manner, or taken any other action that would constitute a distribution under, or render the disposition to Assignee or the disposition by Assignee to any other party of any of the Assets (or any interest therein or evidence thereof) a violation of the Securities Act or of any other securities law or require registration or qualification pursuant thereto, nor will it act, nor has it authorized or will it authorize any person or entity to so act, in any such manner with respect to the Assets (or any interest therein or evidence thereof).

f.      Either (i) Assignee is not an employee benefit plan within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or a plan within the meaning of Section 4975(e)(l) of the Internal Revenue Code, and Assignee is not, directly or indirectly, purchasing the Assets on behalf of, as investment manager of, as named fiduciary of, as trustee of or with assets of any such plan; or (ii) Assignee's purchase of the Assets (A) will not cause Assignor to be deemed a fiduciary of any such plan, or (B) either will not result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code or will be exempt from the prohibited transaction rules in Section 406 of ERISA and Section 4975 of the Internal Revenue Code.

4.      Assignee's Indemnification.    Assignee hereby indemnifies and holds harmless and agrees to defend Assignor, the failed bank, and Assignor's agents and employees (the "Indemnified Parties") from and against any and all damages, liabilities, losses, costs, charges, liens, deficiencies and expenses of any nature (including, without limitation, reasonable attorneys' fees and all other actual litigation costs) suffered or incurred by or assessed against the Indemnified Parties from and after the date hereof as a result of (i) Assignee's failure to perform the assumed Obligations, or (ii) Assignee's failure to pay the assumed liabilities identified in Section 2 above, or (iii) Assignee's breach of any representation, warranty or covenant contained in this Assignment.

5.      Beneficiaries of this Assignment.    This Assignment shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective successors and

3

assigns, and the Federal Deposit Insurance Corporation in its corporate capacity shall be a third-party beneficiary with respect hereto.

6.    Incorporation of terms of LSA.    This Assignment is made, executed and delivered pursuant to the LSA, and is subject to all of the terms, provisions and conditions thereof.

7.    Controlling Law.    Federal law of the United States shall control this Agreement. To the extent that federal law does not supply a rule of decision, this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York. Nothing in this Agreement will require any unlawful action or inaction by either party.

8.    Counterparts.    This Assignment may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

4

IN WITNESS WHEREOF, each of the parties has caused this Assignment and Assumption of Interests and Obligations to be executed and delivered by its duly authorized officer or agent as of the day and year first written above.

**ASSIGNOR:**

FEDERAL DEPOSIT INSURANCE CORPORATION as RECEIVER for DOWNEY SAVINGS & LOAN ASSOCIATION, F.A.

By: _____  
Name: _____  
Witness

By: _____  
Name: Steven A. Carr  
Title: Attorney-in-Fact

**ASSIGNEE:**

U.S. BANK NATIONAL ASSOCIATION

By: _____  
Name: _____  
Witness

By: _____  
Name: Terrance R. Dolan  
Title: Executive Vice President & Controller

## ACKNOWLEDGMENT

STATE OF _Texas_ )

)

COUNTY OF _Dallas_ )

Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared _Steven A Carr_, known to me to be the person whose name is subscribed to the foregoing instrument, as _Receiver_ of _Downey Savings & Loan Association FA_, and acknowledged to me that s/he executed the same as the act of the _Receiver_ _____, for the purposes and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office on this the /4th day of _April_,

200_9_.

_Cassandra T. Knighton_

Notary Public

My Commission expires: _Jan 11, 2010_

CASSANDRA TERESA KNIGHTON
MY COMMISSION EXPIRES
January 11, 2010

IN WITNESS WHEREOF, each of the parties has caused this Assignment and Assumption of Interests and Obligations to be executed and delivered by its duly authorized officer or agent as of the day and year first written above.

**ASSIGNOR:**

FEDERAL DEPOSIT INSURANCE CORPORATION as RECEIVER for DOWNEY SAVINGS & LOAN ASSOCIATION, F.A.

By: _____       By: _____
Name: _____      Name: _____
      Witness                     Title:  Attorney-in-Fact

**ASSIGNEE:**

U.S. BANK NATIONAL ASSOCIATION

By: _____       By: _____
Name: _Karen J. Canon_____    Name: Terrance R. Dolan
      Witness                     Title:  Executive Vice President &
                                           Controller

**ACKNOWLEDGMENT**

STATE OF *Minnesota* )
)
COUNTY OF *Hennepin* )

    Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared *Terronce R. Dolan*, known to me to be the person whose name is subscribed to the foregoing instrument, as *EVP. Controller* of *US Bank National Association*, and acknowledged to me that s/he executed the same as the act of the *US Bank National Association*, for the purposes and consideration therein expressed, and in the capacity therein stated.

    Given under my hand and seal of office on this the *1* day of *April*,
20 *09*.

 

Notary Public
My Commission expires: *1/31/2010*

Home > News & Events > Press Releases

# Press Releases

## U.S. Bank Acquires All the Deposits of Two Southern California Institutions
### Downey Savings & Loan Association, Newport Beach and PFF Bank & Trust, Pomona

**FOR IMMEDIATE RELEASE**
**November 21, 2008**

**Media Contact:**
**Andrew Gray (202) 898-7192**
**Cell: (202) 494-1049**
**David Barr: (202) 898-6992**
**Cell: (703) 622-4790**

U.S. Bank, National Association, Minneapolis, MN, acquired the banking operations, including all the deposits, of Downey Savings and Loan Association, F.A., Newport Beach, CA, and PFF Bank & Trust, Pomona, CA, in a transaction facilitated by the Federal Deposit Insurance Corporation.

The combined 213 branches of the two organizations will reopen as branches of U.S. Bank under their normal business hours, including those with Saturday hours. Depositors will automatically become depositors of U.S. Bank. Deposits will continue to be insured by the FDIC, so there is no need for customers to change their banking relationship to retain their deposit insurance coverage.

Customers of both banks should continue to use their existing branches until U.S. Bank can fully integrate the deposit records of the organizations. Over the weekend, depositors can access their money by writing checks or using ATM or debit cards.

As of September 30, 2008, Downey Savings had total assets of $12.8 billion and total deposits of $9.7 billion. PFF Bank had total assets of $3.7 billion and total deposits of $2.4 billion. Besides assuming all the deposits from the two California banks, U.S. Bank will purchase virtually all their assets. The FDIC will retain any remaining assets for later disposition.

The FDIC and U.S. Bank entered into a loss share transaction. U.S. Bank will assume the first $1.6 billion of losses on the asset pools covered under the loss share agreement, equal to the net asset position at close. The FDIC will then share in any further losses. Under the agreement, U.S. Bank will implement a loan modification program similar to the one the FDIC announced in August stemming from the failure of IndyMac Bank, F.S.B., Pasadena, CA.

The loss-sharing arrangement is expected to maximize returns on the assets covered by keeping them in the private sector. The agreement also is expected to minimize disruptions for loan customers as they will maintain a banking relationship.

Customers who have questions about today's transactions can call the FDIC toll free. Customers of Downey Savings should call 1-800-930-5169, and for PFF Bank 1-800-930-6827. The phone numbers will be operational this evening until 9:00 p.m. pacific; on Saturday from 8:00 a.m. to 6:00 p.m. pacific; and on Sunday noon until 6:00 p.m. pacific and thereafter from 8:00a.m. to 8:00 p.m. pacific. Interested parties can also visit the FDIC's Web site. For Downey Savings they can visit http://www.fdic.gov /bank/individual/failed/downey.html and for PFF Bank http://www.fdic.gov/bank/individual/failed/pff.html.

U.S. Bank currently has 353 offices in California. Downey Savings and PFF Bank are not affiliated with each other. Downey Savings has 170 branches in California and five in Arizona, and PFF Bank has 38 branches in California.

The FDIC estimates that the cost to the Deposit Insurance Fund (DIF) for Downey Savings will be $1.4 billion and $700 million for PFF Bank. U.S. Bank's acquisition of all the deposits of the two institutions was the "least costly" option for the FDIC's DIF compared to alternatives.

These were the twenty first and twenty second banks to fail in the nation this year, and the fourth and

fifth banks to close in California. The last bank to be closed in the state was Security Pacific Bank, Los Angeles, on November 7, 2008.

# # #

Congress created the Federal Deposit Insurance Corporation in 1933 to restore public confidence in the nation's banking system. The FDIC insures deposits at the nation's 8,451 banks and savings associations and it promotes the safety and soundness of these institutions by identifying, monitoring and addressing risks to which they are exposed. The FDIC receives no federal tax dollars – insured financial institutions fund its operations.

FDIC press releases and other information are available on the Internet at www.fdic.gov, by subscription electronically (go to www.fdic.gov/about/subscriptions/index.html) and may also be obtained through the FDIC's Public Information Center (877-275-3342 or 703-562-2200). **PR-124-2008**

Last Updated 11/21/2008                                    communications@fdic.gov

**Home    Contact Us    Search    Help    SiteMap    Forms**
Freedom of Information Act (FOIA) Service Center    Website Policies    USA.gov
FDIC Office of Inspector General

B6A (Official Form 6A) (12/07)

IN RE **Brown, John Andrew & Brown, Michele Helene**       Case No. _____
Debtor(s)                          (If known)

# SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether the husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

**Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim."

If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| DESCRIPTION AND LOCATION OF PROPERTY | NATURE OF DEBTOR'S INTEREST IN PROPERTY | HUSBAND, WIFE, JOINT, OR COMMUNITY | CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION | AMOUNT OF SECURED CLAIM |
|---|---|---|---|---|
| **Single family residence at 5151 Dorman Drive, San Diego, CA 92115**<br>**3 bd/2 bath-partially under construction and in foreclosure** | **Fee Simple** | **W** | **634,500.00** | **901,469.42** |
| | | **TOTAL** | **634,500.00** | |

(Report also on Summary of Schedules)

© 1993-2010 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

B6D (Official Form 6D) (12/07)

**IN RE** Brown, John Andrew & Brown, Michele Helene _____ Case No. _____
                   Debtor(s)                                 (If known)

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is the creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H – Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim Without Deducting Value of Collateral" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion, if Any" on the Statistical Summary of Certain Liabilities and Related Data.

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE AND ACCOUNT NUMBER. *(See Instructions Above.)* | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO. **5872**<br>**BMW Financial Services**<br>**P O Box 3608**<br>**Dublin, OH 43016-0306** | | W | **1/08**<br>**Auto lease - 2008 BMW X5**<br><br><br>VALUE $ **37,945.00** | | | | 1,014.00 | |
| ACCOUNT NO. **2589**<br>**JP Morgan Chase Bank**<br>**P O Box 272**<br>**Worthington, OH 43085** | | W | **10/19/04**<br>**2nd mortgage - 5151 Dorman Dr, San Diego, CA**<br><br>VALUE $ **634,500.00** | | | | 251,259.44 | 221,969.42 |
| ACCOUNT NO.<br>**Kuvestco, Inc**<br>**5387 Soledad Mountain Rd**<br>**La Jolla, CA 92037** | | W | **9/24/07**<br>**3rd trust deed - 5151 Dorman Dr, San Diego, CA**<br><br>VALUE $ **634,500.00** | | | | 45,000.00 | 45,000.00 |
| ACCOUNT NO. **5465**<br>**Solana Financial Company**<br>**2424 Hoover Ave Ste E**<br>**National City, CA 91950** | | H | **5/14/09**<br>**Auto Loan - 2001 Ford Ranger**<br><br><br>VALUE $ **2,690.00** | | | | 3,616.51 | 926.51 |

    **1** continuation sheets attached

| | | |
|---|---|---|
| Subtotal<br>(Total of this page) | $ **300,889.95** | $ **267,895.93** |
| Total<br>(Use only on last page) | $ | $ |
| | (Report also on Summary of Schedules.) | (If applicable, report also on Statistical Summary of Certain Liabilities and Related Data.) |

© 1993-2010 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

B6D (Official Form 6D) (12/07) - Cont.

**IN RE** Brown, John Andrew & Brown, Michele Helene _____ Case No. _____
                     Debtor(s)                                                (If known)

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE AND ACCOUNT NUMBER. *(See Instructions Above.)* | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO. **4066**<br><br>**U.S. Bank Home Mortgage**<br>**P O Box 6060**<br>**Newport Beach, CA 92658-6060** | | W | **9/9/05**<br>**1st Mortgage - 5151 Dorman Dr., San Diego, CA**<br><br>VALUE $ **634,500.00** | | | | **605,209.98** | |
| ACCOUNT NO. **4100**<br><br>**Wells Fargo Dealer Services**<br>**P O Box 168048**<br>**Irving, TX 75016-8048** | | H | **12/06**<br>**Auto Loan - 2002 Volvo S60**<br><br>VALUE $ **5,150.00** | | | | **3,085.60** | |
| ACCOUNT NO.<br><br><br>VALUE $ | | | | | | | | |
| ACCOUNT NO.<br><br><br>VALUE $ | | | | | | | | |
| ACCOUNT NO.<br><br><br>VALUE $ | | | | | | | | |
| ACCOUNT NO.<br><br><br>VALUE $ | | | | | | | | |

Sheet no. **1** of **1** continuation sheets attached to
Schedule of Creditors Holding Secured Claims

| | | |
|---|---|---|
| Subtotal<br>(Total of this page) | $ **608,295.58** | $ |
| Total<br>(Use only on last page) | $ **909,185.53** | $ **267,895.93** |
| | (Report also on Summary of Schedules.) | (If applicable, report also on Statistical Summary of Certain Liabilities and Related Data.) |

© 1993-2010 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only